Harold G. COGDILL, Appellant,

v.

Richard S. SCHWEIKER, Secretary, Department of Health and Human Services, Appellee.

No. 83–2123.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1984.

Decided Sept. 19, 1984.

James H. Holloway, Cherokee, N.C. (T. Graham Duls and Western North Carolina Legal Services, Inc., Cherokee, N.C., on brief), for appellant.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Harold G. Cogdill appeals the district court's entry of summary judgment in favor of the Secretary of Health and Human Services affirming the Secretary's final decision terminating his social security disability benefits. After the Secretary's decision was rendered, we held in *Dotson v. Schweiker*, 719 F.2d 80 (4th Cir.1983), that after an initial determination of disability, the claimant is entitled to a presumption of continued disability, which the Secretary is required to rebut before benefits can be terminated. Because we conclude that the Secretary's decisional process deprived Cogdill of the force of that presumption, we reverse the judgment of the district court and remand the case to the district court with instructions to remand to the Secretary for a new hearing in light of our decision in *Dotson*.

I

Cogdill applied for disability benefits in June of 1979 claiming disability due to a tumor and related blood pressure problems. It was then determined that he was disabled with an onset date of February 19, 1979, and he thereafter began receiving disability benefits.

As early as 1970, Cogdill began experiencing symptoms associated with high blood pressure. He testified that for two or three years prior to 1979 he experienced periods of blurred vision and pounding of the heart such that he was forced to leave work and either go home or to the hospital. Under the care of Dr. J.E. Oliver, Cogdill was admitted to C.J. Harris Hospital on February 20, 1979, complaining of labile hypertension. Discharged on February 27, 1979, he was instructed not to return to work, but to stay home and take it easy. While hospitalized, his blood pressure fluctuated from 150/90 to 120/76.

As a result of his diagnosis of a probable pheochromocytoma, a tumor associated with sustained hypertension, Dr. Oliver referred Cogdill to the North Carolina Baptist Hospital in Winston-Salem, North Carolina. Upon admission, Cogdill underwent a series of tests to determine the existence of pheochromocytoma which yielded no evidence of a tumor. After his refusal to undergo an arteriogram, he was discharged. Readmitted on April 7, 1979, for more tests, Cogdill was again discharged, at his own request, on April 20, 1979, when he refused to submit to an angiography. When he later underwent an angiogram on May 13, 1979, it failed to indicate signs of vascular masses suggestive of a tumor. Again, he was admitted to North Carolina Baptist Hospital on June 15, 1979, for proposed exploratory surgery, but was discharged, at his own request, on July 20, 1979, after refusing surgery.

On the recommendation of Dr. Boyce, his treating physician at North Carolina Baptist, Cogdill was admitted to the Cleveland Clinic, which specializes in diagnosing pheochromocytoma, on August 4, 1980. During his eleven-day stay, his blood pressure remained within normal limits and there were no symptoms of a tumor. In addition, he underwent a clonidine suppression test whereby upon a single dose of clonidine, his blood pressure dropped significantly. In the opinion of Dr. Emanuel Bravo, based on these tests, Cogdill did not suffer from a tumor associated with high blood pressure, but seemed to display characteristics of autonomic hyperreflexia.

In November of 1980, Cogdill began seeing Dr. J.D. Dirkers for continued treat-

ment of his hypertension. Cogdill's blood pressure was then found not quite but nearly normal.

On Cogdill's final visit to the Cleveland Clinic in March of 1981, the clonidine treatment was discontinued. Further testing revealed that his high blood pressure could be normalized within two hours of the administration of a placebo. As a result of tests which supported a finding that Cogdill's blood pressure was influenced by psychological and neural factors, the diagnosis at discharge was hypertension resistant to therapy.

During the course of the administrative hearing, Cogdill testified that his blood pressure increased when he sat down or stood up and that he continued to experience seizures on a sporadic basis which caused dimmed vision, shortness of breath, and foaming of the mouth. He further testified that he had pain in his right kidney, side, and back most of the time, that his vision was getting worse, and that he sees dots in front of his eyes about ninety percent of the time, but he was able to read, walk ¾ of a mile to town, drive occasionally, and work in his garden for 10–15 minutes before sitting down.

The Secretary determined, based upon the disability review process, that Cogdill's disability ceased in August of 1980. However, the Appeals Council amended that ruling and ordered the cessation of benefits as of March of 1981. On review by the district court, summary judgment was entered in favor of the Secretary on October 28, 1983. This appeal followed.

## II

In *Dotson v. Schweiker*, 719 F.2d 80, 81 (4th Cir.1983), we recognized that if in connection with a disability termination proceeding the Secretary is allowed to submit the same medical evidence upon which disability was initially determined to support a later determination that disability had ceased, it would have the effect of allowing the Secretary "as many 'bites of the apple' as he wants." In order to avoid this anomalous result, we adopted the rule laid down by the Ninth Circuit in *Patti v. Schweiker*, 669 F.2d 582 (9th Cir.1982). Under that rule, although the ultimate burden of persuasion with respect to proving disability remains with the claimant, once there has been an initial determination of disability, the claimant is entitled to a presumption of continued disability, which the Secretary is required to rebut in order to terminate benefits. Rebuttal must be by evidence that the claimant's condition has improved between the time of the initial determination of disability and the time of the termination hearing. *Pack v. Heckler*, 740 F.2d 292, 294 (4th Cir.1984).

On this appeal, even though the final decision to terminate benefits was made prior to our holding in *Dotson*, the Secretary contends that the requirements of *Dotson* were satisfied.[1] We disagree.

The major thrust of the evidence presented by the Secretary at the administrative termination hearing was to support the proposition that the initial determination of disability was based on a misdiagnosis, that Cogdill then suffered from pheochromocytoma. Rather than coming forward with proof of the claimant's improvement in the interim between the first and second hearings, the Secretary, by the evidence produced, primarily attacked the initial finding of disability. In *Dotson*, we rejected the Secretary's argument that a mistake in awarding benefits, *e.g.*, an original mistake in diagnosis, could be attacked by having another physician interpret the same evidence, upon which disability was based, to support cessation of benefits. Evidence that disability benefits were mistakenly awarded in the first place cannot be used to rebut the *Dotson* presumption.[2]

---

1. The district court purported to apply *Dotson* in reviewing the Secretary's final decision, but we are persuaded that the important purpose of the presumption of continued disability requires

that it be applied in the first instance by the Secretary.

2. Elementary principles of *res judicata* that accord finality to the original determination and

We conclude, consistent with our holding in *Dotson*, that the claimant in the present case was deprived in the administrative hearing of a presumption of continued disability. We therefore reverse the judgment of the district court and remand the case to that court with instructions to remand the case to the Secretary for a new hearing in light of *Dotson*.

REVERSED AND REMANDED WITH INSTRUCTIONS.

protect it from any but direct attack of course dictate this result. *See Restatement (Second) Judgments* § 27. The effect of the *Dotson* presumption is, in these terms, to confront the Secretary with the fact, not subject to collateral attack, that disability did exist as of the date of the initial determination and to require that she demonstrate that disability has been *removed* in the interval, not that it never existed. Concededly, this may result in a practical inability to terminate benefits when in objective fact disability has never existed. But the principles of finality embodied in *res judicata* necessarily assume a primacy for those principles over the occasional injustice that could be disclosed by belated discoveries of erroneous prior fact findings in any context. The alternative is precisely to allow the "second bite" by indirection that we sought to forestall in *Dotson*.